HAL B. FOUTZ AND LIANE FOUTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
FOUTZ v. COMMISSIONER
Docket Nos. 3396-73, 2625-74.
United States Tax Court
T.C. Memo 1978-471; 1978 Tax Ct. Memo LEXIS 44; 37 T.C.M. (CCH) 1849-12; November 27, 1978, Filed *44 Respondent used the bank deposits method of recomputing income, due to inadequate records maintained by petitioners. Petitioners refused to supply possible corroborating information due to their fear of possible criminal prosecution.Held, undisputed increase in petitioners' bank accounts, all designated as being generated from business activities, are sufficient to carry respondent's burden of showing omissions from gross income for purposes of section 6501(e)(1) (A)(i), thus shifting to petitioners the burden of explaining why the increases do not represent taxable income. Petitioners' fear of criminal prosecution did not justify their refusal to cooperate. Petitioners have failed to show that they did not understate their gross income by 25 percent or less and thus the six-year statute of limitations exception in section 6501(e) applies to permit assessment. Elwin C. Leavitt, for the petitioners. Richard A. Jones, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income *45 tax and penalties under section 6653(a) [1] as follows: [2]
Docket
Penalty under
No.
Year
Deficiency
Sec. 6653(a)
3396-73
1966
$ 1,305.95
$ 65.30
2625-74
1967
1,125.10
56.26
1968
12,489.23
624.46 At trial, upon joint oral motion of both parties, the issue relating *46 to the 25 percent omission of gross income exception to the three-year statute of limitations rule was severed from the remaining issues. It is the only issue with which we are concerned here. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Hal B. and Liane Foutz, husband and wife, filed timely joint income tax returns using the cash basis method of accounting for the years 1966, 1967, and 1968 with the Western Region Service Center at Ogden, Utah. Petitioners resided in Las Vegas, Nev., at the time their petition herein was filed.
The notice of deficiency was mailed to petitioners on March 13, 1973, with respect to the taxable year 1966 and on April 5, 1974, with respect to the taxable years 1967 and 1968.
During the years at issue, petitioner Hal B. Foutz (hereafter Foutz) was engaged in the following business activities as a sole proprietor: a travel agency doing business as Desert Travel Bureau; car rentals doing business as Capital Car Rental of Nevada; used car sales doing business as Hal's Motors; and car transportation, doing business *47 as Hal's Drive-For-U. No corporate, small business corporation or partnership tax returns were filed for the years 1966, 1967, or 1968 by or on behalf of petitioners with respect to the above-named businesses. The investigation to determine petitioners' income tax liability for the years in issue began prior to June 1970. Up until January 29, 1971, the revenue agents conducted their investigation without any of petitioners' books and records. The records petitioners provided respondent on January 29 were not complete, [3] and the revenue agents were unable to reconcile the amounts reflected on petitioners' returns with these records. Respondent then determined petitioners' income using the bank deposits and expenditures method of reconstructing income. In reconstructing and analyzing the deposits to and withdrawals from the bank accounts maintained by Foutz during the years at issue, respondent contacted all banks in and around the Las Vegas, Nev., area to determine the banks with which petitioners *48 maintained bank accounts and engaged in loan activities during the relevant periods. From the readily available bank records respondent then determined and documented all deposits, withdrawals, loans, and interbank transfers with respect to the bank accounts maintained by Foutz during the years at issue, and organized and analyzed the records obtained from petitioners on January 29, 1971. To the extent not determinable from the readily available bank records initially acquired from the banks and the records acquired from petitioners on January 29, 1971, respondent searched various banks' microfilmed records of deposit items, contacted car dealers, petitioners' customers, creditors, and other third parties to determine the source of all deposits to the bank accounts maintained by Foutz during the years at issue. Respondent completed his field investigation of petitioners' income tax returns in March 1972. Petitioners and their counsel received copies of respondent's determination with respect to the income tax liability of petitioners for the three years at issue on or about July 18, 1972. The basis for respondent's determination was first explained to petitioners' representatives *49 prior to July 18, 1972, and then once more prior to the issuance of the notices of deficiency. A complete set of respondent's exhibits consisting of the deposit and disbursement schedules for each of petitioners' bank accounts was provided to petitioners or their representatives prior to August 25, 1975. Petitioners' counsel was again provided with a complete set of these exhibits on or before December 6, 1976. During the preparation of these cases for trial, the revenue agent assisting respondent's counsel met with Foutz and his counsel and offered to discuss any asserted errors with respect to respondent's determination. During these pre-trial conferences, it was made clear that anyone properly authorized by Foutz or his counsel would be allowed access to the records upon which respondent based his determination. To the date of trial of these cases, neither Foutz, his counsel, nor his accountant requested access to the documentation supporting respondent's determination contained in respondent's exhibits. Furthermore, neither Foutz, his counsel, nor his accountant provided respondent with any specific information as to possible misclassification of deposits or checks. *50 During the first part of the audit, Foutz was also under criminal investigation by special agents of the Intelligence Division of the Internal Revenue Service, and petitioner's refusal to cooperate was due in large part to the criminal investigation. Petitioners, through their attorney, requested a letter to confirm the revenue agent's oral assurances that the criminal investigation had been discontinued. Pursuant to I.R.S. procedures, no written confirmation was ever given petitioners. However, as of April 15, 1975, the statute of limitations precluded criminal prosecution with respect to any of the years at issue. Later, in petitioners' "Motion for Continuance" filed with this Court on August 25, 1975, Foutz executed an affidavit which stated that his accountant would be able to demonstrate that some of the allocations made by respondent to income were in fact loans and that other unspecified items included in petitioners' income were funds belonging to clients. Nonetheless, no such evidence was provided respondent. During the taxable year 1966 Foutz maintained bank accounts and made deposits thereto of $432,620.17 as follows: Bank
Account No.
Account Name
Deposits
Bank of Las Vegas
3290335
Desert Travel Bureau
$ 182,614.53
Bank of Nevada
01 028 6474
Desert Travel Bureau
103,536.76
Nevada State Bank
002290017
Desert Travel Bureau
41,896.59
Bank of Nevada
01 017 3961
Capital Car Rental
86,406.49
First National Bank
301 4149
Insured Driveaway
11,993.40
Nevada Bank of Commerce
12 000809 0
Hal's Motors
6,172.40
*51 During the taxable year 1967, Foutz maintained bank accounts and made deposits thereto of $598,510.49 as follows: Bank
Account No.
Account Name
Deposits
Bank of Las Vegas
3290335
Desert Travel Bureau
$ 414,785.66
Bank of Nevada
01 028 6474
Desert Travel Bureau
54,538.71
Nevada State Bank
002290017
Desert Travel Bureau
73,148.40
Nevada Bank of Commerce
19 0000375
Desert Travel Bureau
16,781.57
Bank of Nevada
01 017 3961
Capital Car Rental
35,780.39
First National Bank
301 4149
Insured Driveaway
3,435.76
Nevada Bank of Commerce
12 000809 0
Hal's Motors
40.00
During the taxable year 1968, Foutz maintained bank accounts and made deposits thereto of $548,942.97 as follows: Bank of Las Vegas
3290335
Desert Travel Bureau
$ 168,510.08
Bank of Nevada
01 028 6474
Desert Travel Bureau
150,332.50
Nevada State Bank
002290017
Desert Travel Bureau
32,227.35
Nevada Bank of Commerce
19 0000375
Desert Travel Bureau
58,249.36
Bank of Las Vegas
32 0143
Desert Travel Bureau
139,623.68
Respondent adjusted the total amounts deposited by eliminating loan proceeds, interbank transfers, and redeposits. [4]
*52 Foutz reported gross income of $39,601.21, $39,995.36, and $107,754.78 on his income tax returns for 1966, 1967, and 1968, respectively. During the years in issue, Foutz paid part of his business expenses in cash, the sources of which were undeposited funds on hand received from Foutz's business customers. During 1968, $19,665.59 in undeposited business receipts received by Foutz was expended for business purposes. Petitioners paid the following amounts to American Express Company during the three years in issue: $10,024.21 in 1966; $3,138.79 in 1967; and $1,031.70 in 1968. When petitioners (through their travel agency business) received proceeds from the sales of airline tickets, they were not entitled to keep any of the funds until their sales reports were processed by the airline company. At that time, petitioners became entitled to keep their commissions earned on the sales and paid the various airlines individually by check the net amount received from the sales less their five or ten percent commission. Later, this procedure was modified so that petitioners had to write only one check payable directly to either the Air Traffic Conference or the International Air Transport *53 Association, depending on whether the flight was national or international. Additionally, petitioners would sometimes have to refund deposits when customers decided to change or cancel their planned trips.These deposits were not segregated from petitioners' other operating funds, however. Petitioners, through their travel agency business, also arranged trips by steamship, bus, and railroad for customers. Respondent allowed all checks to airlines or transportation companies, including steamship lines, the Air Traffic Conference and International Air Transport Association, domestic airlines not members of the Air Traffic Conference, bus lines, and railroads, as deductions.Amounts paid to the Air Traffic Conference, international airlines, and steamship lines totaled $166,256.33 in 1966, $256,959.81 in 1967, and $165,976.83 in 1968. Amounts paid by petitioners to other domestic airlines, bus lines, and railroads totaled an additional $1,493.40 in 1966, $25,826.93 in 1967, and $6,660.16 in 1968. In conjunction with their travel agency business, petitioners also arranged sales or leases of cars to clients who travelled overseas. Petitioners received the total purchase price or *54 lease cost of the car, and then turned over to the lessor or car dealer the proceeds less their commission. Petitioners, through Hal's Motors, also sold cars as an agent for Hertz. Auto sales proceeds in the years at issue totaled $6,951.39 in 1966, $4,475 in 1967, and $32,787.05 in 1968. Gains from these sales as reported on petitioners' income tax returns for these years totaled $2,684.06 in 1966, $88.13 in 1967, and $11,057.41 in 1968. OPINION The only question presented to us is whether the statute of limitations bars assessment of the deficiencies determined in the instant case. The general rule of section 6501(a) imposes a three-year statute of limitations for the assessment of income tax deficiencies. In the instant case, respondent's notices of deficiency were received by petitioners beyond the normal three-year limitation period for each of the taxable years in question. However, respondent relies upon the exception set forth in section 6501(e), which extends the limitation period to six years with respect to taxable years in which gross income has been understated by greater than 25 percent. Section 6501(e) states: (e) Substantial Omission of Items.-- Except *55 as otherwise provided in subsection (c)-- (1) Income taxes.--In the case of any tax imposed by subtitle A-- (A) General rule.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph-- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item. By recomputing petitioners' gross income using the bank deposits method, respondent *56 determined that petitioners omitted well in excess of 25 percent of their gross income from their tax returns for each of the three years in question. Although the parties agree that some of petitioners' records were missing at the time petitioners prepared their income tax returns, petitioners contend that records were available from their creditors which substantiate the amount shown on their returns and which respondent ignored while making his recomputation using the bank deposits and expenditures method. Additionally, petitioners assert that personal knowledge of their business operations which would have shown the sources of funds was not provided to respondent because of petitioners' fear of possible criminal fraud prosecution. They argue that respondent is, therefore, not entitled to recompute their income because they maintained adequate books and records or, alternatively, that the recomputation, if valid, was arbitrary. While we agree with petitioners that respondent may not disregard petitioners' explanations reasonably susceptible of being checked, where relevant leads are not forthcoming, respondent is not required to negate every possible source of nontaxable *57 income, a matter peculiarly within petitioners' personal knowledge.. The revenue agent in this case made an exhaustive search of available records to determine the source of all the deposits in issue. Petitioners and their counsel were provided a detailed schedule of the agent's computations and yet never offered any evidence to respondent to support their contentions, even after the statute of limitations had run on the potential criminal case. [5] Cf. . Moreover, a taxpayer cannot refuse to cooperate with the agent conducting a tax investigation and then claim that the resulting determination by the Commissioner was arbitrary when the agent acted reasonably, taking into consideration the information available to him. , affd. . In , affd. in part and revd. in part on other grounds , cert.denied , we noted that the fact *58 that a special agent of the Intelligence Division was present at all stages of respondent's investigation was not sufficient to transform petitioner's recalcitrance into a procedural windfall, notwithstanding that petitioner's attorney may have regarded certain of petitioner's constitutional privileges to be at stake. Thus, we believe that respondent was entitled to use the bank deposits method in this case and that the recomputation was not arbitrary. The bank deposits method is an accepted means of recomputing income. Its theory is to treat as gross income all amounts deposited into bank accounts and the method typically does not require identification of the items of gross income. . However, because section 6501(e) is an exception to the general three-year statute of limitations, the presumption of the correctness of the deficiency notice ordinarily attaching to respondent's *59 determination does not apply and respondent has the burden of proving that petitioners omitted from their tax returns an amount in excess of 25 percent of the gross income they reported for 1966, 1967, and 1968. ; , affd. . The bank deposits in question here have all been determined by respondent to have been made from petitioners' trade or business and thus subject to the provisions of section 6501(e)(1)(A)(i). Therefore, respondent has the burden to show that for the specific purpose of the 25 percent omission rule of section 6501(e)(1)(A)(i), petitioners' businesses were a likely source of the deposits. See . Petitioners have stipulated that the amount of bank deposits and expenditures are accurate and challenge only the nature of certain deposits made to business accounts and the nature and purpose of certain disbursements. We believe that the undisputed increases in petitioners' bank accounts, all related in some manner to business activities, represent a sufficient *60 prima facie case to carry respondent's burden of showing omissions from gross income for purpose of section 6501(e)(1)(A)(i), thus shifting to petitioners the burden of proving any contention that these increases do not represent taxable income. See . Petitioners in their brief set forth the following specific objections to respondent's inclusion of items into petitioners' gross income: (1) Amounts paid to the Air Traffic Conference, airlines, International Air Transport Association, steamship lines, railroads, and bus lines represented funds belonging to those businesses and did not represent petitioners' own funds. (2) Sales of travelers' checks by petitioners were in the nature of a banking function and did not produce income to petitioners except for any commissions received on the sales. (3) Customers made deposits which did not become petitioners' income until the sales became final on tours, charters, and automobiles, many of which were later refunded by petitioners in cash. (4) Funds from certain car sales included by respondent were actually from sales made by petitioners of other person's cars and *61 were simply transmitted through one of petitioners' accounts; Foutz received only commission fees for the transfers and only such amounts are Foutz's income. Also, in at least one instance, funds were transmitted to pay taxes on the purchase of a foreign vehicle. (5) Checks were cashed for customers from funds taken from ticket sales made by petitioners. In turn, these checks would be deposited in the bank; later, more funds would be withdrawn from one of the bank accounts in order to have additional cash on hand to cash more checks. (6) Refunds were made in cash to customers on certain ticket sales; because little cash was kept on hand, petitioners or their employees would go to the bank and withdraw funds to make the refunds. (7) There were other general refunds made by petitioners. Amounts Paid to Airlines, Steamship Lines, etc.
Although respondent allowed amounts paid over to the Air Traffic Conference, international airlines, and steamship lines as deductible business expenses, respondent on brief concedes that such amounts should not be reflected in gross income because it appears that the proceeds (net of commissions) were not petitioners' funds. [6] We believe *62 that respondent should have also excluded those amounts paid to other domestic airlines, buses, and railroads, for it seems likely (although the record provides little corroboration) that such amounts also did not constitute earnings received by petitioner under a claim of right and without restriction as to disposition.. Travelers' Checks
Foutz testified that he had an American Express credit card which he used to charge personal and business expenses and that he sold travelers' checks to third parties for which he received only a commission. Petitioners paid the following amounts to American Express during the *63 three years at issue: $10,024.21 in 1966, $3,138.79 in 1967, and $1,031.70 in 1968. Petitioners, however, have not shown what portions of these amounts were in payment for travelers' checks sold and what portions were paid by petitioners for their own personal and business charges. Moreover, petitioners did not segregate any of these funds, and all checks to American Express were drawn upon petitioners' general business accounts. Therefore, we do not believe that amounts paid to American Express should reduce petitioners' gross income. Deposits
Deposits made by customers to be applied against future sales are ordinarily not income until the taxpayer's right to retain them becomes fixed. . Assuming arguendo that petitioners received funds from sales transactions which properly should not have been included as gross income by respondent, petitioners have provided us with no information from which we might determine or even estimate that amount. Since the burden of proof is on petitioners to refute respondent's recomputation, we cannot allow any reduction for alleged deposits.
Car Sales and Foreign *64 Tax on Automobiles
Respondent, for purposes of section 6501(e) only, has conceded that the sales of automobiles should not be treated as sales made by Foutz as a dealer in the ordinary course of business. Therefore, only the gains from such transactions, rather than the entire proceeds of the sales, should be included as omissions from gross income for purposes of section 6501(e). Checks Cashed
Again, petitioners have produced no evidence to show the extent to which they cashed checks for customers.Moreover, it appears that petitioners claim they used, in part, undeposited ticket sales receipts to cash these checks. To the extent that is true, inclusion o the checks in gross income would represent only proceeds from ticket sales, and as noted earlier, such sales were eliminated by respondent from gross income. On these facts, we do not believe any reductions should be made from gross income for checks allegedly cashed. Refunds
We do not believe that refunds made by petitioners to customers on ticket sales or general sales refunds would properly reduce gross income. When petitioners, cash basis taxpayers, received these sales proceeds, the transactions were completed *65 and petitioners' right to the proceeds was absolute. [7] The fact that some or all of the sales proceeds might have to be refunded in the event of cancellation does not affect their nature as income.See ; ; . Cf. ; . Thus, any subsequent refund would be a deduction from and not a reduction in gross income. Moreover, to the extent that such refunds were made from cash-on-hand, no reduction could be allowed even if otherwise proper because undeposited funds were not included as gross receipts by respondent. Having reached our decision on the propriety of respondent's computations and petitioners' various objections thereto, the determination whether petitioners have understated their gross *66 income by greater than 25 percent may be made by the following computations: [8]
1966
Total Deposits
$ 432,620.17
Less: Non-income Deposits
Loan proceeds
$ 57,020.00
Interbank transfers
57,462.94
Trust funds [9]
167,749.73
Auto Sales Proceeds
6,951.39
289,184.06
$ 143,436.11
Add: Gains from Automobile
Sales--per return
2,684.06
Reportable Gross Income
$ 146,120.17
Gross Income as Reported
39,601.21
Understatement of Gross Income
$ 106,518.96
25 percent of Gross Income as Reported $ 9,900.30
1967
Total Deposits
$ 598,510.49
Less: Non-income Deposits
Loan proceeds
$ 37,485.00
Interbank transfers
79,333.29
Trust funds [9]
282,786.74
Auto Sales Proceeds
4,475.00
404,080.03
Reportable Gross Income
$ 194,430.46
Gross Income as Reported
39,995.36
Understatement of Gross Income
$ 154,435.10
25 percent of Gross Income as Reported $ 9,998.84
1968
Total Deposits
548,942.97
Less: Non-income Deposits
Loan proceeds
$ 121,665.43
Interbank Transfers
35,880.78
Trust funds [9]
172,636.99
Redeposits
100.00
Auto Sales Proceeds
32,787.05
363,070.25
Reportable Gross Income
$ 185,872.72
Understatement of Gross Income
$ 78,117.94
25 percent of Gross Income as Reported
$ 26,938.70
*67 Because petitioners have understated their gross income by greater than 25 percent for each of the years in issue, the section 6501(e) exception to section 6501(a) applies, and the statute of limitations does not bar the assessment of the deficiencies. An appropriate order will be issued.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect for the years in issue. ↩
2. Upon joint motion by the parties, the cases in docket Nos. 3396-73 and 2625-74 were consolidated for trial, briefing, and opinion.↩
3. In part, petitioners lacked records because of two burglaries, one in 1966 and one in 1968, in which ledgers, receipts, cancelled checks, and other records were stolen.↩
4. ↩
1966
1967
1968
Loan Proceeds
$ 57,020.00
$ 37,485.00
$ 121,665.43
Interbank transfers
57,462.94
79,333.29
35,880.78
Redeposits
100
5. Petitioners also contend that they are, in part, unable to refute certain of respondent's computations because the revenue agents did not return all of their records. However, we do not believe petitioners have substantiated this claim.↩
6. Respondent's deposit schedules do not specifically identify all of the deposits of the ticket sales proceeds nor do they identify the commission portion of the deposited ticket proceeds. However, the net amounts paid to the Air Traffic Conference, international airlines and steamship lines during the years at issue were determined from respondent's schedules of withdrawals from such bank accounts and these payments would equal the deposited ticket sales proceeds (net of retained commissions).↩
7. Any refunds which were allocable to deposits would also not reduce gross income because, as we noted earlier, such deposits would not be brought into income until the transaction was completed.↩
8. It can be readily seen from these computations that even were we to allow as reductions from gross income all amounts attributable to travelers' checks or any refunds made by petitioners (substantiated by checks), the understatement would still greatly exceed 25 percent.↩
9. Amounts paid to the Air Traffic Conference, international airlines, steamship lines, other domestic airlines, bus lines, and railroads.↩